[This page is intentionally left blank]

INDEX OF SPECIAL APPENDIX

Page

Petitioner's request of the Department of Transportation to stay
    the effective date of Enhancing Transparency of Airline
    Ancillary Service Fees, 89 Fed. Reg. 34620 (Apr. 30, 2024)
    (June 5, 2024)…………............................................................ SA01

The Department of Transportation's denial of Petitioner's request
    to stay the effective date of the Rule (June 28, 2024)................. SA14

Declaration of Edward M. Christie III, President and Chief
    Executive Officer, Spirit Airlines, Inc. (July 26, 2024)................. SA18

Declaration of Barry L. Biffle, Chief Executive Officer, Frontier
    Group Holdings, Inc. d/b/a Frontier Airlines (July 26, 2024)…... SA35



June 5, 2024

The Honorable Peter P. M. Buttigieg
Secretary
U.S. Department of Transportation
1200 New Jersey Avenue S.E.
Washington, D. C. 20590

**Re:  Request to Stay Effective Date and Compliance Periods of the Final
Rule on *Enhancing Transparency of Airline Ancillary Service Fees***

Dear Secretary Buttigieg:

Spirit Airlines, Inc. respectfully requests the Department stay the effectiveness and compliance period of its Final Rule on *Enhancing Transparency of Airline Ancillary Service Fees* (the Rule)[1] pending resolution of the Petition for Review in *Airlines for America et al. v. Department of Transportation*[2] and such other appeals that may be timely filed challenging the rule.

Spirit endorses and incorporates by reference the points made in the letter submitted May 31, 2024, to the Department by counsel for Airlines for America (A4A) in connection with its Petition for Review of the Rule in the Fifth Circuit.  As set forth below, Spirit is submitting additional reasons for a stay that apply most directly to post-deregulation low-fare carriers such as Spirit.  Low-fare new entrants are a favored class under the Airline Deregulation Act of 1978 (ADA), and the new rules will disproportionally harm their business.  The new Rule stifles the very innovation the ADA was intended to promote and leads consumers to ignore important pricing options.  As explained by A4A, the Department lacks authority to dictate price advertising, the practices the Department seeks to regulate are inherently not unfair or deceptive, and the Rule violates various provisions of the Administrative Procedure Act.

Spirit agrees with A4A.  It is likely the Fifth Circuit will hold the Rule unlawful and stay the Rule's effectiveness during the pendency of the Court's review.[3]  Accordingly, and for the reasons set forth below, it is in the public interest for the Department to grant the stay request of Spirit and A4A.

---

[1] 89 Fed. Reg. 34620 (Apr. 30, 2024).

[2] Case No. 24-60231 (5th Cir.)

[3] Indeed, today the Fifth Circuit struck down a similar "fee disclosure" rule recently promulgated by the Securities and Exchange Commission under the guise of "protect[ing] investors who invest in private funds and to prevent fraud, deception, or manipulation" – closely analogous arguments to those put forth by the Department.  Opinion, *Nat'l Assoc. of Priv. Fund Mgrs. v. SEC*, Case No. 23-60471 (5th Cir., June 5, 2024).

## Background

The Airline Deregulation Act of 1978 abolished Government control over carrier routes, pricing, services, and accommodations.[4]  Congress chose instead to promote to the maximum extent possible competitive forces that would usher in improved service, innovation and lower fares in an industry historically "*constrained by excessive regulation*" and "*bureaucracy.*"[5]  During passage of the ADA, House Transportation Committee Chairman Glenn Anderson emphasized on the House Floor that the legislation "*requires the [Department] to place maximum reliance on actual and potential competition; to encourage entry by new carriers; to strengthen small air carriers; and to encourage low-fare service.*"[6]

Freed from "*excess Government regulation,*" industry innovation that was emphatically focused on low-cost services catering to "*an even wider and more diverse clientele*" of price-sensitive travelers immediately boomed.[7]  In 1981 following Deregulation, People Express Airlines launched one early version of the unbundled model ("no frills") which it advertised as "flying that costs less than driving."[8]  The unbundled fares advertised included one carry-on bag, while checked baggage, food, and drink, were all sold as separate components.  This was in stark contrast to the large/legacy carrier model of maximizing what was included in a ticket, which also maximized the cost to consumers and shut out a large segment of society from air travel. The legislative history of the ADA overflowed with bipartisan Member statements supporting instead consumer choice, lower-cost air travel, and bringing *"[e]ntirely new groups of consumers previously precluded from air travel due to high costs ... in the market for airline tickets."[9]*

Innovation continued in the decades following Deregulation, enabling carriers like Spirit to pioneer a low-fare unbundled service model which provides the most value and choice to customers of limited means who likely would not fly otherwise.  The Department's new Rule seeks to stifle this era of innovation and cost-reductions by mandating the time, place, and manner of advertising a homogenized, single-fare product; as well as by controlling discrete aspects of commercial decisions down to the minutia of managing what information airlines provide to ticket sellers, severely undermining airline control of product distribution.  The Rule is contrary to congressional direction and the free market which has provided maximum benefits and lowered prices to consumers for decades.

## Legal Argument

As explained in the A4A letter, the Department is authorized by the Administrative Procedure Act (APA) to postpone the effective date and corresponding compliance periods

---

[4] Pub L. 95-504, Airline Deregulation Act of 1978 (Oct. 24 ,1978).
[5] 124 Cong. Rec. H38525-26 (Oct. 14, 1978) (Statement of Rep. Harsha).
[6] 124 Cong. Rec. H38521 (Oct. 14, 1978) (Statement of Rep. Anderson).
[7] 124 Cong. Rec. H38525 (Oct. 14, 1978) (Statement of Rep. Ertel).
[8] "People Express ... has 'unbundled' the costs associated with travel." St. Louis Post-Dispatch (Aug, 28 1985).
[9] 124 Cong. Rec. S37418 (Oct. 14, 1978) (Statement of Sen. Kennedy).

of the Rule, pending judicial review.[10]  It should do so.  The points addressed by the A4A letter, as well as those raised by this request on unique harm to smaller low-fare carriers more than satisfy the four-part test compelling a stay.  Specifically, (1) the appellant airlines are likely to prevail on the merits; (2) the appellants and Spirit will suffer irreparable injury if relief is withheld; (3) no substantial harm will come to the government or travelers if relief is granted; and (4) a stay serves the public interest.[11]

I.    **The 5th Circuit Will Likely Reject the Rule Because the Department Lacks Authority to Mandate Airline Price Advertising and the Rule is Legally Defective under the Requirements of the Administrative Procedure Act**

When an agency acts pursuant to its rulemaking authority, a reviewing court determines whether the resulting regulation exceeds the agency's statutory authority or is arbitrary and capricious.[12]  Courts do not rely on an agency assertion that the scope of a rule is authorized under its rulemaking authority.[13]

A.    **Congress Specifically Eliminated the Department's Regulatory Authority to Direct Airline Pricing and Price Advertising in the 1978 Airline Deregulation Act**

Spirit agrees with A4A that the ADA eliminated the power to regulate price and price advertising.  This includes, as A4A noted, removing Section 1002(d) of the Federal Aviation Act of 1958 relating to unfair pricing practices.  However, Congress spoke most clearly in the context of removing CAB/DOT authority over price advertising and fare bundling by eliminating Sections 403 and 404, respectively, of the Federal Aviation Act.  Section 403 was the CAB authority under which it could require carriers to advertise fares to the public "*in such form and manner, and [with] such information, as the Board shall by regulation prescribe.*"[14]  The ADA abolished this authority and did not transfer it to 49 U.S.C. § 41712 or any other statute.  Accordingly, the Department lacks substantive authority to regulate price advertising and the Rule must be struck down.

Removal of Section 403 and 404 authority was consistent with the purpose of the ADA to promote innovation, including offering the public unbundled, lower-cost air fare and

---

[10] 5 U.S.C. § 705 ("When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review."); *see also* Fed. R. App. P. 18.

[11] *See, e.g., CSX Transp., Inc. v. Williams*, 406 F.3d 667, 670 (D.C. Cir. 2005); Letter from Jim L. Swart, Director, Office of Drug and Alcohol Policy and Compliance, to William F. Sheehan, Counsel for BNSF Railway Company, Docket DOT-OST-2003-15245 (Oct. 30, 2008).

[12] *N.Y. Stock Exch. LLC v. SEC*, 447 U.S. App. D.C. 281, 286, 962 F.3d 541, 546 (2020) (citing *Sullivan v. Zebley*, 493 U.S. 521, 528, 110 S. Ct. 885, 107 L. Ed. 2d 967 (1990)); *see also Nat'l Assoc. of Priv. Fund Mgrs. v. SEC*, Case No. 23-60471 (5th Cir., June 5, 2024) ("[W]here 'Congress wanted to provide for' reporting and disclosure of certain information, 'it did so explicitly.') (quoting *Barnhart v. Sigmon Coal Co.*, 534 U.S. 438, 452 (2002); *RadLAX Gateway Hotel, LLC v. Amalgamated Bank,* 566 U.S. 639, 646 (2012)).

[13] *Id.* (citing *Michigan v. EPA*, 576 U.S. 743, 135 S. Ct. 2699, 2706-07, 192 L. Ed. 2d 674 (2015)).

[14] Pub. L. 85-726, Federal Aviation Act of 1958, Sec. 403(a) (Aug. 23, 1958).

services. "*When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.*"[15]  The Rule unlawfully undoes Congressional intent by mandating that airlines reintegrate air transportation service components conforming to the Department's view of an "idealized" standardized product to be advertised with every ticket purchase.  By dictating exactly how airlines display certain services that are not required for a customer to fly, indeed acting as if it had retained its authority to regulate how prices are presented and sold from pre-Deregulation, the Department fails to give "*real and substantial effect*" to § 40(a) of the ADA which explicitly repealed Sections 403 and 404.

The Department's assertion of authority to promulgate this rule fails for another reason:  the Government previously held authority to review whether fares and advertised prices were **"unjust," "unreasonable," or "discriminatory" toward passengers**.  Carrier failures to publish fare components in a tariff were always enforced against these standards by the CAB under Section 403 and 404 powers – authority which no longer exists.  Importantly, these practices were <u>not</u> regulated or investigated under former Section 411, now 41712, which the Department seeks to do with this new Rule.

Indeed, the Department's focus on "critical ancillary services" under the Rule is not in any way a new concept.  The idea matches the pre-Deregulation CAB rules mandating that certain services be included in published fares – as A4A explains, in a specific format, at a specific time, and in a specific manner.  The CAB single-rate system encompassed many services other than the transportation itself, including carry-on baggage; checked baggage; reserved seats; cancellation and change fees; no show fees; and others.[16]  Congress expressly rejected this mandated practice through passage of the ADA and CAB Sunset Act of 1984.  By contradicting Congressional intent against standardized fares, the Department not only harms the smaller, low-cost carriers it is directed to support, and the innovation they introduced, but also most significantly the price-sensitive travelers who rely on them.  "*Regardless of how serious the problem an administrative agency seeks to address . . . it may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'*"[17]

---

[15] *Stone v. INS*, 514 U.S. 386, 397, 115 S. Ct. 1537, 1545 (1995) (citations omitted).  Even the removal of a single, material word must be given meaning, as the "most likely inference in these circumstances is that Congress deliberately dropped the term." *United States v. Wells*, 519 U.S. 482, 493 (1997) (cited by Scalia & Garner, at 257).  These Canons apply with more force to the elimination of an entire provision.

[16] *See, e.g.*, Order 72-6-49 Dismissing Complaint, *Aldo Del Noce v. American Airlines, Inc.*, Docket 21385, Civil Aeronautics Board (June 12, 1972) (discussing CAB regulations for fare disclosures under Section 403).

[17] *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 91 (2002) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125, 120 S. Ct. 1291, 146 L. Ed. 2d 121 (2000)).

**B.    The Rule Compels Airlines to Advertise Certain Ancillary Services, which Far Exceeds the Residual Scope of the Department's Section 41712 Authority Retained under the ADA**

In further support of Section I.A.3 in the A4A letter, Spirit agrees the Department is seeking to regulate price advertising and, indirectly, prices under the narrow authority in Section 41712 which has always been intended to focus on violations akin to those prohibited by the Clayton and Sherman Acts and other very limited areas unrelated to the publication of fares.[18]   There is no evidence that Congress intended this statute as authority for the Department to intrusively micromanage the competitive marketplace under the guise of "simplifying" transactions for consumers.   Indeed *"[p]recedent teaches that there are 'extraordinary cases' in which the 'history and the breadth of the authority that [the agency] has asserted,' and the 'economic and political significance' of that assertion, provide a 'reason to hesitate before concluding that Congress' meant to confer such authority."*[19]   The Rule presents such a conflict.

Based on its legislative history, the ADA explicitly rejected this kind of indirect price control – and as the Supreme Court has held, "***compelling or restricting price advertising surely 'relates to' price***."[20] While the Department may frame the Rule as a "consumer protection," which it argues is therefore related to unfair or deceptive practices, this two-step explanation is the same type of "wafer-thin" gap filler that *West Virginia v. EPA* rejects.[21]

The fact that the Department can pass consumer regulations like refund practices does not fall in the same category as these elements of carrier pricing which were part of, and included in, airfares before Deregulation and left to competition by the Act.  This is consistent with the overwhelming Congressional mandate in the ADA supporting a hands-off regulatory scheme to support innovative, low-cost services.[22]  Congress has shown that it can and will provide regulatory authority, such as in Chapter 417 addressing the "Operations of Carriers," if it

---

[18]  *See, e.g.*, *House Committee on Public Works and Transportation Report* on the *Civil Aeronautics Board Sunset Act of 1983*, H. Rep. No. 98-793 (May 21, 1984) ("Acting under [sections 404, 411, and 102], the Board has promulgated regulations protecting consumers in such areas as overbooking and denied boarding compensation, limitations on liability for lost or damaged baggage, smoking, discrimination against the handicapped, terms of charter service, and the notice which airlines must give passengers of contractual terms between the passenger and the carrier. ... [T]hese regulations touch relatively limited areas of airline operations....").

[19]  *West Virginia v. EPA*, 597 U.S. 697, 142 S. Ct. 2587, 2595 (2022) (Citing FDA v. Brown & Williamson Tobacco Corp., 529 U. S. 120, 159-160).

[20]  *Morales v. TWA*, 504 U.S. 374, 388-89 (1992) (emphasis added) (quoting *Travel* v. *American Airlines, Inc.*, 889 F.2d 751, 754 (7th Cir. 1989)).

[21]  *West Virginia v. EPA*, 597 U.S. 697, 142 S. Ct. 2587, 2608-09 (2022).

[22]  *See* 49 U.S.C. § 40101 (policy factors); §41109 (restricting the Department from ""adding or changing schedules, equipment, ***accommodations***, and facilities for providing the authorized transportation ***to satisfy business development and public demand***.").

intends for the Department to address new issues including in the area of consumer protection.[23]

### C. The Rule Violates the First Amendment and the APA by Restricting Truthful Advertising of Standalone Fares and Compelling Airlines to Advertise a Bundled Airfare Product under Any Circumstance

Advertising an unbundled standalone airfare product, which does not include optional add-on services such as checked bags, is a lawful activity and is not "*more likely to deceive the public than to inform it.*"[24] This activity is protected commercial speech under the First Amendment, which can only be restricted by regulation which satisfies an intermediate scrutiny analysis.[25] To satisfy intermediate scrutiny, the Department bears the burden of establishing: (1) the government has a substantial interest in restricting airlines from advertising unbundled airfares on their own websites; (2) the Rule directly advances the government interest; and (3) the Rule is narrowly tailored to achieve the interest such that "*a more limited restriction on commercial speech*" could not.[26]

The Department cannot establish a substantial interest in preventing airlines from advertising air transportation services which can lawfully be sold (*i.e.,* a travel ticket that does not include checked baggage); just as it cannot restrict airlines from selling such standalone fares to consumers which willingly seek them out. Such restriction on speech interferes with every statutory policy factor directing the Department to be hands-off in supporting competition – and indeed the entire purpose of the ADA.

The primary interest asserted in the Rule is the implausible assertion that "*[i]t appears that consumers are generally unaware of the amount of the ancillary fees that apply to them when they book tickets.*"[27] This conclusion is undermined by nearly a half-century of separate pricing for checked-bags since passage of the ADA, Department rules requiring their disclosure, industry practice that assure full disclosure of all components of the final price before purchase, and that fact that only the consumer chooses what ancillary products they will purchase. The Rule also appears to assert there is some kind of government interest in purportedly providing a few seconds of convenience to consumers who might want to

---

[23] In 49 U.S.C. Chapter 417 Congress has authorized the Department to address matters involving individuals with disabilities, wheelchairs, joint venture agreements, musical instruments, strollers, cell phones, etc.

[24] *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 563-64 (1980) (emphasis added) (citing *Friedman v. Rogers*, 440 U.S. 1. (1979)).

[25] *Id.* at 564.

[26] "As in other contexts, these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but ***also that the law does not seek to suppress a disfavored message.***" *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 572 (2011) (emphasis added) (citing *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 662-663 (1994)).

[27] 89 Fed. Reg. 34620, 34624 (Apr. 30, 2024).

compare the costs of a Department-specified type of bundled fare product. These reasons cannot and do not carry the Government's burden under the *Central Hudson* test.[28]

Neither can the Department meet the remaining two factors under *Central Hudson*. The Department "*cannot regulate speech that poses no danger to the asserted state interest, ... nor can it completely suppress information when narrower restrictions on expression would serve its interest.*"[29] Here, the Rule arbitrarily determines that consumers are harmed simply because they are shown the valid price of a ticket (including carrier-imposed fees, per Department rules) without at the same time seeing charges for additional, optional add-on services they are not required to purchase to travel.

The Department is not truly addressing the issue of whether airlines should disclose pricing for add-on components, because these prices are already available through less restrictive means. On Spirit's website, for example, anyone can immediately find the cost of optional services at any time during the booking process (but of course prior to purchase) – both generally and for specific itineraries. Further, after a traveler selects their flight, they are given the choice to add whichever optional services fit their needs for the specific flight they chose. This is a common-sense practice, and the Rule provides no substantive explanation supporting the Department's assertion otherwise.

The Department appears to have recognized the First Amendment concerns with carrier speech restrictions under the Rule, as it indicated in the now-withdrawn 2021 Advanced NPRM on Airfare Advertising. The 2021 ANPRM correctly highlighted that over the last decade the Supreme Court "*has consistently reviewed commercial speech restrictions more stringently ... [and] also recently made clear that expansively applying legal standards to uphold laws imposing restrictions on the size and appearance of speech is inconsistent with its governing precedent.*"[30]

Because the Rule restricts truthful advertising for lawful activities, seeks to advance interests directly contrary to Deregulation, and ignores far less excessive means to provide consumers access to fare component information, it violates the First Amendment and the APA.[31]

---

[28] *See also All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 252 (5th Cir. 2023) ("But on the other hand, neither [the agency] nor the public has any interest in enforcing a regulation that violates federal law.") (citing *Louisiana*, 55 F.4th at 1035 ("There is generally no public interest in the perpetuation of unlawful agency action.")).

[29] *Id.* at 565.

[30] Airfare Advertising, Advanced Notice of Proposed Rulemaking, Docket DOT-OST-2021-0007 (Jan 15, 2021).

[31] *See* 5 U.S.C. § 706(2)(A) (The reviewing court shall ... hold unlawful and set aside agency action, findings, and conclusions found to be ... contrary to constitutional right, power, privilege, or immunity.").

### D. The Rule Violates the Administrative Procedure Act Because the Department Ignored its Fundamental Competition Mandates and Failed to Reasonably Analyze the Rule's Disparate Costs to Smaller Carriers and the Traveling Public

Agency action under the APA must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[32] "Arbitrary and capricious review focuses on whether an agency articulated a rational connection between the facts found and the decision made."[33] The agency is required to consider all "relevant factors" before making a reasoned decision.[34] In promulgating the Rule, the Department ignored its overwhelming competition mandate, the express purpose of Deregulation under the ADA, and other key substantive factors which arose throughout the rulemaking process.

As relevant here, the Department was required to consider whether the Rule is "in the public interest and consistent with public convenience and necessity"[35] Congress directed the Department to consider the following policy factors, as applicable to the Rule:

- "placing maximum reliance on competitive market forces and on actual and potential competition"[36];

- "the availability of a variety of adequate, economic, efficient, and low-priced services"[37];

- "avoiding unreasonable industry concentration, excessive market domination, monopoly powers, and other [anticompetitive] conditions"[38];

- "the continued strengthening of small air carriers to ensure a more effective and competitive airline industry"[39];

- "encouraging, developing, and maintaining an air transportation system *relying on actual and potential competition—*
  *(A) to provide efficiency, innovation, and low prices; and*
  *(B) to decide on the variety and quality of, and determine prices for, air transportation services.*"[40]

---

[32] 5 U.S.C. § 706(2)(A).

[33] *Mexican Gulf Fishing Co. v. United States DOC*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *ExxonMobil Pipeline Co. v. U.S. Dept. of Transportation*, 867 F.3d 564, 571 (5th Cir. 2017)).

[34] *E.g., Michigan v. EPA*, 576 U.S. 743 (2015); *Texas v. EPA*, 983 F.3d 826, 835 (5th Cir. 2020) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

[35] 49 U.S.C. § 40101(a).

[36] *Id.* § 40101(a)(6).

[37] *Id.* § 40101(a)(4).

[38] *Id.* § 40101(a)(10).

[39] *Id.* § 40101(a)(13).

[40] *Id.* § 40101(a)(12) (emphasis added). The Rule failed to acknowledge most of these factors.

While Congress unequivocally directed the Department to maximize competition, nowhere does Department observance of this objective show up in the Rule. Indeed, while the Department uses the word "competition" 57 times in the Rule, not once does it analyze the Rule's impact on competition beyond one-sentence, threadbare conclusions amounting to the Department simply disagreeing with commenters.[41] The Department's burden "*is __not__ satisfied by an agency decision that ignores an important aspect of the problem before it or relies upon a threadbare explanation.*"[42]

"[T]o determine whether the agency considered the relevant factors, the court must [also] decide whether the agency addressed any 'significant points . . . raised by the public comments.'"[43] While the Department spent many pages in the Rule regurgitating comments, its responses to them were similarly threadbare and lacking meaningful substance sufficient to avoid Arbitrary and Capricious classification. When commenters carefully raised the serious concern that the Rule would effectively destroy the "business model of unbundled offerings," the Department simply concluded without substantiation that: "*The rule does not prohibit such a model, and by improving the disclosure of fees associated with ancillary services, the Department believes that the rule helps to improve the model by making it more transparent to consumers.*"[44]

Commenters raised concerns about the disproportionate disadvantage the rule would bear on smaller, low-cost carriers,[45] to which the Department responded with a similar bold, unsubstantiated, and irrelevant conclusory statement: "*Rather than placing ULCCs at a competitive disadvantage, the Department expects that this rule will promote competition by making fees for critical ancillary services more transparent for consumers.*"[46] Similar hackneyed responses were made to just about every comment submitted by Spirit and other airlines – they were all ignored without the Department giving due weight to the relevant issues raised. These issues include, among others:

- An invalid Regulatory Impact Analysis (RIA)which claimed data out of thin air and was insufficient to support the Department's conclusions in the Rule.[47] As A4A

---

[41] *See, e.g.*, 89 Fed. Reg. at 34628 ("The harm that consumers experience is not outweighed by benefits to consumers or competition because consumer confusion about applicable bag fees harms, rather than benefits, competition and creates less than optimal purchasing decisions by consumers.").

[42] *Spirit Airlines, Inc. v. DOT*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (emphasis added) (holding that DOT failed to consider the impact of its decision on competition).

[43] *Mexican Gulf Fishing Co. v. United States DOC*, 60 F.4th 956, 971 (5th Cir. 2023) (quoting *Huawei Technologies v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021).

[44] 89 Fed. Reg. at 34634.

[45] 89 Fed. Reg. at 34639.

[46] *Id.*

[47] For example, the entire "deadweight claim," even if true, is irrelevant because customers are fully aware of the total cost before they purchase any service. Under the 24-hour refund rule, any consumer can make a purchase and continue to look at other carrier options before committing to any fare.

highlights in its letter, the RIA was also finalized without prior publication of the Rule in violation of the APA.[48]

- A failure to identify with any specificity who are the "reasonable consumers" the Department relies upon in promulgating the rule – and failing to accurately consider the confusion and cost such consumers will bear as a result of the Rule.

- The cost and business impact of requiring carriers to share real-time information with third-party sellers regarding ancillary services.

- The failure to analyze the impact of the 24-hour refund rule and weighing how as a less-restrictive and more effective tool already ensures consumers know exactly what price they pay for airfare.

Because the Department failed to consider these critical aspects of the problem it purportedly sought to address in the Rule, and because it failed to adequately address relevant comments made by impacted parties like Spirit, the rule is arbitrary and capricious.

## II.    Spirit and Other Low-Fare Carriers Face Extraordinary, Unrecoverable, and Disproportionate Technology and Operational Costs to Implement the Rule which Satisfies Judicial Standards for Showing Irreparable Harm

A private party challenging a rule can establish irreparable harm by showing that the Rule will cause "more than de minimis" financial injury."[49]  Costs incurred to comply with an agency regulation under review have "almost *always* produced the irreparable harm of nonrecoverable compliance costs."[50]  Even recoverable costs may constitute irreparable harm where the losses would threaten the existence of some portion of the party's business.[51]

Failure to stay the Rule would "*immediately hit [Spirit] … with enormous and unrecoverable compliance costs–which would inevitably be passed on to [travelers].*"[52]  These costs, including substantial pass-through costs from third-party vendors and internal direct costs relating to a substantial re-coding of Spirit's third-party e-commerce platform systems are expected to

---

[48] 5 U.S.C. § 706(2)(E) (The reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be … unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute); *See also Spirit Airlines v. DOT* (D.C. Cir. 2021).

[49] *Career Colls. & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024); *See also Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016); *Wages & White Lion Invs., L.L.C. v. United States FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (citations omitted).

[50] *Wages & White Lion Invs., L.L.C.*, 16 F.4th at 1142 (emphasis in original);  *See also Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) ("financial losses [are] irreparable injury "where no 'adequate compensatory or other corrective relief will be available at a later date, **in the ordinary course of litigation**,'" (emphasis added) (quoting *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015)).

[51] *Texas v. EPA*, 829 F.3d at 434.

[52] *Career Colls. & Sch. of Tex.*, 98 F.4th at 255.

exceed $10 million.[53]  Major additional harm to Spirit and other smaller carriers would arise from a chain-reaction of diverting staff and capital expenditures away from priority revenue-enhancing projects and IT upgrades to instead work on Rule compliance.  These projects, now underway or planned for the near term include, among other areas of Spirit's business, ecommerce initiatives, changes to product design, cabin layout initiatives, revisions to the merchandising of ancillary products, enhanced bundling options, cybersecurity initiatives, and changes to loyalty and affinity card programs.  Diversion of resources from those projects will result in substantial forgone revenues estimated to range between $50-100 million over the next six months alone and continuing thereafter at some pace during the period in which Spirit would be forced to delay current and planned projects in order to comply with the Rule.

There are also significant unknowns, including inevitable costs associated with issues the Department did not foresee, but should have, when it implemented the Rule.  For example, almost four percent (4%) of Spirit Guests purchase their itineraries at the airport ticket counter, and there is seemingly no current feasible solution to advertise to these customers all the various optional products the Department demands in the Rule.  Spirit, and every other airline, will need to spend significant time and resources just to consider whether to build entirely new display systems – in addition to the hardware and installation costs if new systems are needed.

Multiply these resource cost demands by every other potential sale or advertisement channel: websites, mobile applications, mobile websites, live contact centers, conversational interactive voice response (IVR) systems, chatbots, ticket agent channels, etc.  The resources required for these activities are extraordinary and directly compete in priority with each other.

As the Department knows, Spirit and other low-fare carriers are experiencing unprecedented business challenges, having incurred heavy financial losses for four straight years, with existential ramifications for the entire low-cost/low-fare segment of the airline industry if current trends continue.[54]  Smaller carriers simply do not have the kind of resources readily available to handle such a monumental task in the time permitted by the Rule.  Nor would any low-cost carrier business readily staff its IT department at the levels necessary to do so.  And as for any carrier, low-fare or otherwise, which cannot meet the Rule's implementation deadlines, they also face the cost/threat of Department enforcement action.

Ultimately, it is price-sensitive consumers that will bear the costs of the Rule by way of higher ticket prices it will force across all airlines, as well the loss in near-term product and

---

[53] Spirit and other smaller competitive carriers lack the kind of massive inhouse IT engineering support team that United CEO Scott Kirby recently touted this week on his Air Show podcast interview. *See*, *The Air Show*, *The Scott Kirby Interview* (June 4, 2024).

[54] *Id.* (Kirby opined that ULCCs will not exist in five years).

efficiency innovations across the board as carriers shift resources to comply with a Rule that may very well be struck down.

### III. Other Parties Will not be Harmed by a Temporary Hold on an Unprecedented Rule Homogenizing a Forced Advertisement of Air Transportation Components

A temporary stay of the Rule will not harm any party.[55]  Notably, the Rule does not provide travelers any pricing information not currently readily available to them prior to purchase. This system exists because the consumer can better understand information delivered from a faucet rather than a firehose.  Indeed, travel sites comparing several different airlines also do not display ancillary service charges upfront, despite having no motivation to hide these charges, because this current system is easily understood by the consumer.

The new requirements will confuse customers as to whether fees for ancillary products and services are included in the largest number, which numbers correspond to which fees, and whether the fees are optional.  Air travel price listings are already crowded with information regarding the dates, times, prices, and class of each ticket, doubly so for round-trip tickets. Further differentiation in offerings and prices may occur according to loyalty program status, which is usually not known up front.  The result is a huge multiplication of what airline platforms need to do.  More information at once means not only an exponential increase in system database "queries" processed by a carrier's e-commerce platform (accommodation of which increase drives the substantial re-programming expense and investments in hardware) but also a far greater likelihood of consumer confusion. The current price listing system exists precisely because it is easier for the consumer to digest information separately. When the Rule is inevitably struck down by the 5th Circuit and pricing displays change again, it will confuse consumers *even more*.

Even if the Department disagrees and were to think that other parties could be harmed by a stay, this reason alone is insufficient to deny the requested stay. The four factors supporting a stay are balanced against each other rather than being treated independently. "If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in other areas are rather weak."[56]

### IV. The Public Interest is Well-Served by Preserving the Status Quo while Courts Review the Lawfulness of this Unprecedented Rule

The public interest strongly favors a stay here.[57]  Current Department rules already ensure that no traveler pays for any services they do not want.  Should the Court rule in the airlines'

---

[55] Additionally, no party will benefit from implementation of a rule that exceeds the Department's authority. *All. for Hippocratic Med.*, 78 F.4th at 252 ("But on the other hand, neither FDA nor the public has any interest in enforcing a regulation that violates federal law.") (citation omitted).

[56] *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998) (citing *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 746 (D.C. Cir. 1995)).

[57] The third and fourth factors for a stay – harm to other parties and the public interest – "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 420 (2009).

favor, the cost and disruption caused to undo the rule far exceed any costs imposed on the government or customers by a delay in implementation.

### Conclusion

As explained above, the Rule is unlawful and is inconsistent with the overwhelming public interest mandate of the Department to support the protected class of low-fare carriers, the diversity of services and competition they provide, and the especially price-sensitive category of travelers that use their services. Accordingly, a stay should be granted.

Respectfully submitted,

Joanne W. Young
David M. Kirstein
Donald L. Crowell

**Kirstein & Young PLLC**
1750 K Street NW, Suite 700
Washington, DC 20006
Phone: (202) 331-3348
Fax: (202) 331-3933
jyoung@yklaw.com
dkirstein@yklaw.com
dcrowell@yklaw.com

*Counsel for Spirit Airlines, Inc.*



**U.S. Department
of Transportation**
Office of the Secretary
of Transportation

**General Counsel**

1200 New Jersey Avenue, SE
Washington, D.C. 20590

June 28, 2024

Joanne W. Young
Kirstein & Young PLLC
1750 K Street NW, Suite 700
Washington, DC 20006
(202) 331-3348
jyoung@yklaw.com
Counsel for Spirit Airlines, Inc.

RE:  Denial of Spirit Airlines's (Spirit) Request to Stay the Effective Date of
*Enhancing Transparency of Airline Ancillary Service Fees*, 89 Fed. Reg. 34,620
(Apr. 30, 2024) (the Ancillary Service Fees Rule)

Dear Ms. Young:

I write in response to Spirit's letter of June 5, 2024, in which Spirit requests that the U.S.
Department of Transportation (DOT) stay the effective date of the Ancillary Service Fees Rule.
After due consideration, DOT declines to stay the effective date of the Ancillary Service Fees
Rule. On June 10, 2024, the Department denied a request from Airlines for America (A4A),[1]
which sought to stay the effective date of the Rule pending judicial review for largely similar
reasons to those stated in Spirit's letter. The Department denies Spirit's request for the reasons
stated in the A4A denial letter and response to A4A's request for a stay, attached hereto, and for
the additional reasons stated below.

As explained in the A4A denial letter and the Rule, the Department is committed to
taking actions to promote the interests of American workers, businesses, and consumers. The
Ancillary Service Fees Rule is a lawful and critical piece of the Department's efforts to protect
American consumers from unfair and deceptive practices by air carriers, including Spirit, and we
strongly believe it is not in the public interest to stay the Rule.

---

[1] Spirit references, *see* Ltr. at 1, A4A and other carriers' challenge of the Ancillary Service Fees
Rule in the Fifth Circuit, *see Airlines for America, et al. v. DOT*, No. 24-60231 (5th Cir.).
Although Spirit is not formally a party to that lawsuit, it is a member of one of the petitioners and
submitted a declaration in support of the stay motion filed in that action.

Spirit's letter repeatedly mischaracterizes the scope and directive of the Rule, asserting, for example, that the Rule "mandat[es] the time, place, and manner of advertising a homogenized, single-fare product," *see* Ltr. at 2. Spirit also makes the unfounded contentions that the Rule reinstates the Civil Aeronautics Board's (CAB) single-rate system, *see id.* at 4, and "mandat[es] that airlines reintegrate air transportation service components conforming to the Department's view of an 'idealized' standardized product to be advertised with every ticket purchase," *see id.* Rather, the Rule simply requires that carriers and ticket agents provide specific information about change fees, cancellation fees, and baggage fees (first checked bag, second checked bag, and carry-on bag) to consumers upfront when fare and schedule information is provided and provide policy information before ticket purchase. 89 Fed. Reg. at 34,620.[2] The Rule plainly does not "mandat[e] the time, place, and manner of advertising a homogenized, single-fare product." *See* Ltr. At 2.

Spirit's novel claim that "[l]ow-fare new entrants are a favored class under the Airline Deregulation Act of 1978 (ADA)," Ltr. at 1, is without merit. Spirit cites no provision or caselaw for the proposition that the ADA created favored classes, nor does the ADA entertain the idea that ultra-low-cost carriers (ULCCs) constitute a favored class. Nevertheless, during the rulemaking, the Department considered comments that the Rule would be particularly harmful for ULCCs, and duly concluded:

> Regarding the impact of this rule on ULCCs, the Department does not agree with some commenters' view that this rule will unfairly disadvantage ULCCs. Rather than placing ULCCs at a competitive disadvantage, the Department expects that this rule will promote competition by making fees for critical ancillary services more transparent for consumers. This will allow consumers to evaluate whether to purchase air transportation on a given carrier, including a ULCC, with the benefit of more complete up-front pricing information. Given the benefits of the "unbundled" ULCC model that Frontier and others touted in their comments, improved transparency should not cause ULCCs to fundamentally alter such a business model (*i.e.*, changing from an unbundled model to a bundled model). Moreover, nothing in this final rule requires them to do so.

89 Fed. Reg. at 34,639. Spirit's disagreement with the Department's well-reasoned and supported conclusion that the Rule will not unfairly disadvantage ULCCs, is not a basis to stay the Rule. *See, e.g.*, *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 374 F.3d 1251, 1263 (D.C. Cir. 2004) (finding that a "policy disagreement" does not state a claim for an "arbitrary-and-capricious challenge").

Spirit's generalized focus on the ADA is misplaced. First, the Ancillary Service Fees Rule does not conflict with the ADA, as DOT is not asserting Government control over carrier routes, pricing, or services. *See generally* 89 Fed. Reg. 34,620. Second, the statutory authority for the Rule is well established: 49 U.S.C. § 41712(a) charges the Department with protecting consumers from unfair and deceptive practices in air transportation and the sale of air

---

[2] Nor does the Rule assert Government control over carrier routes, pricing, services, and/or accommodations, contrary to Spirit's suggestion. *See* Ltr. at 2.

transportation; 49 U.S.C. § 40113 authorizes the Department to take action, "as appropriate," to "prescrib[e] regulations" as the Department "considers necessary to carry out" Part A of the Act, which includes the unfair-and-deceptive practices provision in section 41712(a) (Part A, subpart ii, ch. 417); and 49 U.S.C. § 40101 directs the Department to consider enumerated factors in carrying out aviation economic programs as being in the public interest and consistent with public convenience and necessity. *See* 89 Fed. Reg. at 34,674. Moreover, Congress provided for civil penalties for any violation of "section 41712 (including a regulation prescribed . . . under such section)." 49 U.S.C. § 46301(a)(5)(D). Spirit's arguments regarding the ADA ignore DOT's authority under section 41712 "to prohibit 'unfair or deceptive practice[s] . . . in air transportation or the sale of air transportation.'" *See Spirit Airlines v. DOT*, 687 F.3d 403, 408 (D.C. Cir. 2012) (quoting 49 U.S.C. § 41712(a)); *see also* A4A Denial Ltr. at 4 (describing congressional ratification of DOT's authority to protect consumers under section 41712). Indeed, most of Spirit's legal arguments repeat views that the D.C. Circuit correctly rejected in *Spirit Airlines v. DOT*.

Spirit's contention that the Department ignored its "fundamental competition mandates," Ltr. at 8, is not supported by the record. In the rulemaking, the Department considered comments that the Rule did not place maximum emphasis on competition as required by 49 U.S.C. § 40101(a)(6)(A). *See* 89 Fed. Reg. at 34,633-34. Specifically, the Department responded to Frontier Airlines' comment that the NPRM was inconsistent with the ADA because DOT allegedly did not place maximum emphasis on competition as required by section 40101(A)(6)(A). In the final rule, the Department concluded:

> To answer the concerns of carriers, the Department believes that this rule does not undermine the business model of unbundled offerings. The rule does not prohibit such a model, and by improving the disclosure of fees associated with ancillary services, the Department believes that the rule helps to improve the model by making it more transparent to consumers. We do note that the unbundled model has proliferated in the marketplace, but we do not agree with commenters' assertion that this is evidence that the model is preferred by consumers and not that they are being deceived by airlines' current disclosure practices. The Department has presented its analysis of how a failure of carriers or tickets agents to provide the disclosures required in this final rule represents an unfair or deceptive practice.

89 Fed. Reg. at 34,634. Again, Spirit's disagreement with the Department's reasonable and supported conclusion states no basis to stay the Rule. *See Public Citizen*, 374 F.3d at 1263.

Contrary to Spirit's assertion, raised for the first time in its request to stay, the Ancillary Service Fees Rule does not violate the First Amendment. As Spirit does elsewhere in its letter, in arguing that DOT "cannot establish a substantial interest in preventing airlines from advertising air transportation services which can lawfully be sold (*i.e.*, a travel ticket that does not include checked baggage)," Ltr. at 6, Spirit misstates the requirements of the Rule. The Rule does not prevent Spirit or any carrier from advertising the cost of a ticket that does not allow checked baggage; the Rule merely requires carriers to inform consumers upfront about the costs of ancillary service fees and to disclose that a particular fare category prohibits the checking of a bag or the carriage of a carry-on bag, if that is the case, and any applicable penalty to transport the item. See 89 Fed. Reg. at 34,646. Regulating the manner of disclosure of prices and fees does

3

not "restrict[] truthful advertising for lawful activities," *see* Ltr. at 7, and is "plainly permit[ted]" by the First Amendment. *See Spirit*, 687 F.3d at 415 (finding that the Department's rule requiring that airlines must make the total, final price of airfare the most prominently listed figure was "plainly permit[ted]" by the First Amendment).

In the final rulemaking and DOT's denial of A4A's request to stay, the Department already considered and rejected the same arguments Spirit makes in sections II, III, and IV of its letter. The Department considered the costs of the Rule, *see, e.g.*, 89 Fed. Reg. at 34,622, the benefits to consumers, *see id.*, and concluded that the public interest is best served by the Rule, *see, e.g.*, A4A Denial Ltr. at 7.

The Department hereby denies Spirit's request to stay the effective date of the Ancillary Service Fees Rule.

Sincerely,

*Blane A. Workie*

Blane A. Workie
Assistant General Counsel
Office of Aviation Consumer Protection

Enclosures:    June 10, 2024, Letter Denying A4A Request to Stay
June 24, 2024, Response to A4A Motion to Stay

4

# In the
# United States Court of Appeals
## For the Fifth Circuit

––––––––––––

No. 24-60373

––––––––––––

SPIRIT AIRLINES, INC.,

*Petitioner,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

––––––––––––

Petition for Review of a Final Rule of the
U.S. Department of Transportation
Agency No. 89 Fed. Reg. 34620

––––––––––––

**Declaration of Edward M. Christie III,
President and Chief Executive Officer,
Spirit Airlines, Inc.**

––––––––––––

Pursuant to 28 U.S.C. § 1746, I, Edward M. Christie III, hereby declare as follows:

**1.** I am the President, Chief Executive Officer, and a member of the Board of Directors at Spirit Airlines, Inc. (Spirit). Spirit's principal place of business is 1731 Radiant Drive, Dania Beach, Florida 33004. I am authorized to make this declaration on Spirit's behalf, and I am personally familiar with the facts stated herein.

**2.** Spirit began service as Charter One Airlines in 1983, following passage of the Airline Deregulation Act of 1978 (ADA). The ADA included a policy statement which envisions an air transportation system based on competition and promotes the development of low fares and new entrants. In 1992, the name of Charter One Airlines was changed to Spirit Airlines, and it began scheduled service.

**3.** In 2007, Spirit introduced a low-fare business model in the United States that separated the base fare for travel from additional services, such as a checked bag, so it could offer the lowest possible base fare. Spirit's business model has generally been referred to as the "ultra-low-fare" business model. Spirit's main customers, which it calls its "Guests," are people traveling for leisure, to visit family and friends, or small businesses.

**4.** Spirit is the largest Ultra-Low-Cost Carrier (ULCC) airline in the country. Under the most current Department of Transportation (Department) data, Spirit accounted for approximately 5.1% of U.S. airline domestic market share.[1]

**5.** Spirit offers dynamic pricing for optional ancillary services (Optional Services)[2] – based on specific markets, as well as the date and time of departure, as well as a given potential passenger's status in Spirit's loyalty program and/or other status (e.g., active military) – to provide customers with the most choice and lowest costs.

**6.** I understand the Department issued a final rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule), which is the subject of the above-referenced case, and that the rule became effective on July 1, 2024.

**7.** Spirit is not able to complete the development and engineering work to its systems required to meet the Rule compliance date to ensure that **all** of its third-party ticket agents have ongoing access to Spirit's Optional Services information in a technical form that is "useable, current, and accessible in realtime." Specifically,

---

[1] Based on domestic revenue passenger miles between May 2023 and April 2024.

[2] The Rule labels these optional components of air transportation, "critical ancillary services."

Spirit does not expect it will be able to provide its third-party distribution channels which use "global distribution systems" (GDS) technology with the required accurate dynamic pricing for Spirit Optional Services both at a passenger-specific and anonymous level. In part this is a limitation of having to display dynamic (constantly changing) prices on a GDS technology that is incapable of readily associating those prices with the fares to which they correspond. The same limitation applies to associating passenger-specific information, such as an email address or loyalty program number, with a particular fare or Optional Service price.

**8.** Approximately $192 million of Spirit's 2023 annual revenue came from sales directly through Spirit's GDS partners. If the Rule is not stayed, Spirit will likely need to stop selling tickets through its GDS partners entirely before October 1, 2024, or, face substantial civil penalties ($75,000 per violation).

**9.** I understand the Rule imposes new, onerous requirements for Spirit regarding the Optional Services, as well as broader areas of airline sales operations including:

> **a.** Preventing Spirit from offering percentage-off discounts on the price of a ticket unless Spirit also includes discounts for government taxes and other fees.

**b.** Requiring Spirit to transmit voluminous passenger-specific and anonymous pricing data for ancillary services – including the cost of a carry-on bag, the first checked bag, the second checked bag, and any other ancillary services the Department decides it wants to require in the future – to all third-parties which Spirit provides itinerary data, in a technical form that is "useable, current, and accessible in realtime."

**c.** Requiring Spirit to effectuate, and develop the technology system that allows for, displaying anonymous and passenger-specific pricing data for ancillary services on the same webpage "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." This information must be provided for every flight option and fare bundle that a customer is presented with on the search results page.

**10.** I understand the Rule establishes a deadline of October 30, 2024 by which Spirit must begin sharing the ancillary service data with ticket agents on an ongoing basis. I further understand that whether the Department would deem

Spirit to be in compliance with this requirement depends on a ticket agent's "reasonable efforts" to access the information as opposed to Spirit's efforts to make the data accessible.

**11.** I understand the Rule sets a deadline of April 30, 2025 by which Spirit must begin displaying across various locations on Spirit's website, mobile app, and any location on which it sells airfare, both passenger-specific and anonymous Optional Service data associated with each itinerary, flight, and bundle combination on an ongoing basis. I understand the Department considers it to be a separate violation each time the Optional Service information is not provided to a customer as required by the rule.

**12.** Compliance with the Rule will require Spirit to reengineer its entire booking/reservation platforms including systems supplied by a third party. Aside from costs, Spirit does not expect it can meet the October 30, 2024, deadline nor does it believe it will be able to meet the April 30, 2025 deadline.

**13.** In January 2024, Spirit contracted for a long-needed, extensive upgrade to its "Navitaire" system which handles the majority of the airline's core commercial and operational functions. Specifically, Navitaire manages the following functionality for Spirit, among others:

    **a.** Pricing and availability for fares, itineraries, and Optional Services.

**b.** Flight scheduling.

**c.** Guest refunds and rebooking.

**d.** Guest reservations, including adding bags, issuing boarding passes, and changing seats.

**e.** Pilot and flight attendant coordination.

**f.** Flight manifests.

**g.** Loyalty programs.

**h.** Spirit.com.

**i.** Spirit mobile applications.

**j.** Airport ticketing.

**k.** Airport boarding.

**l.** Baggage handling and tracking.

**m.** Customer service channels including online chat, interactive voice response (IVR) reservations, text messaging, social media, and WhatsApp communications.

**14.** The Navitaire upgrade must begin in October 2024, and will take approximately three months to complete (January 2025). During this time, Spirit's Navitaire system will be "frozen" and Spirit will be unable to make software

changes to the critical systems noted above. Spirit's secondary testing and development system will also be unavailable during the Navitaire upgrade.

15. If Spirit were to put off updating Navitaire, it t could lead to significant near-term operational and commercial impacts which would lead to significant disruption for its customers, and Spirit would face severe contractual penalties with its third-party partners managing the update.

16.  Without proceeding with this upgrade, Spirit's systems will not be able to meet the computational stress of the exponential increase in processing power required by the Rule to display Optional Services information multiple times more on a single page than currently occurs today. Spirit's systems would either be overwhelmed and too slow for customers to access for booking, refunds, loyalty programs, customer service and more. In an emergency situation– such as a weather-related event or IT outage – the stress to these systems would be much greater, meaning customers would have limited or no access to rebook a flight or request a refund when they need it most.

17. The impossible compliance deadlines also threaten to derail the Navitaire system updates which have been planned since January 2024, nearly four months before the rule was issued. Because Spirit technical staff is working to prepare for the major Navitaire update required in less than three months, Spirit

has minimal resources it can devote strictly to the development and engineering work required to comply with the rule. Realistically, Spirit will not be able to dedicate staffing resources needed to work towards rule compliance until after the Navitaire update is completed in January 2025. As noted above, no changes can be made to Spirit's customer-facing systems between October 2024 and January 2025 while the update is taking place.

**18.** Because Spirit uses dynamic pricing for Optional Services the complexity and resources required to comply with the rule is extraordinary.

**19.** In order to provide the Optional Services information to ticket agents on a continual basis by October 30, 2024, Spirit will need to overhaul many of its systems. These changes include:

    **a.** Significantly and materially altering the infrastructure of the underlying databases so as to be able to functionally accommodate the exponential number of Application Programming Interface requests (referred to as "API calls") required.

    **b.** Rely on all current third-party distribution partners and agents that have access to this information today via New Distribution Capability (NDC) technology to update their systems to be able to request and

accept all of the Optional Services data that would be accessed from Spirit in a theoretical single booking request.

c. Overhaul the underlying infrastructure for communicating pricing data, as it currently is not designed to handle the volume of requests and processing that would be required to provide dynamic pricing for multiple Optional Service products simultaneously for every itinerary search. Third-party aggregators, such as online travel agencies, have made it clear to Spirit that the number of API calls required to abide by this aspect of the Rule would "flood" Spirit's host reservation system to the point of slowing down all responses and rendering the overall host system unable to manage any booking request with a response time that customers would find acceptable. This would apply across any distribution channel, including Spirit's own website and mobile applications.

d. Substantial software development and engineering would be required to enable third-parties to validate the loyalty status or any other type of passenger-specific information that would adjust the pricing of Optional Services based on the customer. For example, active-duty military members receive certain benefits like checked bags

and priority boarding on Spirit. No mechanism currently exists between Spirit and third-party distributors to validate that the "shopper" should receive these Optional Service benefits or otherwise be shown prices different from anonymous shopping requests.

e. Spirit would also need to negotiate agreements with its GDS providers, including costs and technical requirements, to move those providers to a communication technology compatible with the Rule requirements, such as NDC. To this date, Spirit has been unable to reach an agreement with its GDS providers to do so. Without NDC connectivity, Spirit's host reservation system is unable to provide Optional Services data to travel agencies that rely solely on legacy, GDS technology.

20. Importantly, under current Department rules, Spirit already discloses pricing for Optional Services on its website. Customers can access pricing for baggage services quickly before starting the booking process, through a link on the main Spirit website page. Spirit also provides general disclosures concerning baggage pricing on its website. On the initial flight search results page, Spirit indicates if there would be an additional charge to add baggage to an itinerary and includes

a hyperlink to the Spirit webpage for baggage pricing. This baggage pricing tool allows passengers to view whether there is a cost associated with a first or second checked bag on their itinerary and the maximum weight allowance per bag.

21. Once flights are selected, Spirit displays any applicable pricing for optional baggage services on the first page after selection, based on information the passenger has provided. This page is shown to the customer before the checkout page where the customer makes the purchase. Spirit also discloses any costs associated with optional baggage services selected by the consumer on their purchase confirmation/receipt.

22. For Spirit to provide consumers with pricing information on Optional Services in the form the Rule requires, by April 30, 2025, and "at the first point where a fare and schedule is provided in connection with a specific itinerary," the airline will need to reengineer its website and mobile platforms. Because Spirit's baggage pricing is dynamic – based on specific markets, as well as the date and time of departure, as well as a given potential passenger's status in Spirit's loyalty program and/or other status (e.g., active military) – this is an incredibly technical and complex problem to address. Significant time and resources for information technology (IT) development, coding, and testing are required. As a low-cost car-

rier, Spirit does not have a large, in-house IT infrastructure. Spirit's reservation system is provided by a third-party vendor and Spirit will have to fund the third-party costs associated with the required changes.

**23.** Spirit's experience with millions of travelers show that the vast majority of its passengers have no issue with Spirit's current method of providing pricing information for Optional Services.

**24.** It is essential for Spirit's business that consumers be able to conduct a search and make a purchase within a reasonable period of time. Increasing the processing time for searches increases the rate of customers who give up on a search because it was not fast enough. The Rule's new requirements would significantly slow down the processing time for a search and will require substantially more computational resources to meet the demand of multiple additional pricing queries for Optional Services needing to be displayed on the same page as the fare price. Spirit will be required to commit extensive resources to significantly increase the speed of its search function that it would not have otherwise needed to commit.

**25.** Without a stay, Spirit would not likely meet the April 2025 compliance date required by the Rule, even if it devoted every resource and immediately began to implement the changes to its IT systems. These changes include, but may

not be limited to creating and modifying the customer UI (user interface); development of UI changes in website, mobile apps, travel agent portal, call center booking portal; validation and testing of software changes; user acceptance testing; and finally, deployment of the product.

26. Even if Spirit could make all of the above-mentioned UI changes to the various impacted booking channels, it is highly unlikely that the speed of response via the main channels of customer booking and shopping would be acceptable to shoppers without significant underlying infrastructure enhancements and architecture design changes from Spirit's host reservation system provider.

27. To make the changes required and complete the other systems projects that are planned, Spirit will need to hire additional staff, including third party contractors. Obtaining new talent takes time and Spirit will need to begin that search and hiring process immediately. Once hired, the staff will need to be trained and learn aviation-industry-specific requirements.

28. Spirit will need to renegotiate contracts with ticket agents, Global Distribution Systems (GDS), Online Travel Agents (OTA), and metasearch providers. Negotiations will concern the details of the information sharing requirements, including which entity will take on the technical burden and cost. Spirit will have to scope out technical requirements and it is unknown at this time which distribution

partners would need unique connections as these negotiations and decisions normally take significant amounts of time to conclude with no guarantee of a successful outcome.

**29.** Spirit is currently facing a serious financial crisis requiring a major overhaul of its product offerings. Major additional harm to Spirit's business would arise from the chain-reaction of diverting staff and capital expenditures away from high-priority, revenue-enhancing projects and IT upgrades to instead work on Rule compliance. These projects, now underway or planned for the near term, include, among other areas of Spirit's business, ecommerce initiatives, changes to product design, cabin layout initiatives, revisions to the merchandising of ancillary products, enhanced bundled service options, cybersecurity initiatives, and improvements to loyalty and affinity card programs. Diversion of resources from those projects will result in substantial forgone revenues estimated to be at least between $50-100 million over the next twelve months alone and continuing thereafter at some pace during the period in which Spirit would be forced to delay current and planned projects to comply with the Rule.

**30.** The Rule also creates significant and inevitable costs associated with issues the Department did not foresee, but should have, when it implemented the Rule. For example, approximately three percent (3%) of Spirit Guests purchase

their itineraries at the airport ticket counter. There is seemingly no current feasible solution to advertise to these customers all of the Optional Services information the Rule demands. Spirit and other airlines will need to spend significant time and resources in evaluating whether to build entirely new display systems, in addition to the hardware and installation costs for the new display systems if they are needed. These resource-cost demands multiply when considering every other potential sale or advertisement channel, including websites, mobile applications, mobile websites, live contact centers, conversational interactive voice response (IVR) systems, chatbots, ticket agent channels, and others. The resources required for these activities are extraordinary and directly compete in priority with each other.

**31.** Unless the Rule is stayed, Spirit will not be able to recoup the exorbitant, immediate compliance costs, nor tens of millions of dollars in lost revenues resulting from having to delay or abandon new and innovative product enhancements to drive new business and new customers. This is true even if the Court later finds the Rule to be invalid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 26, 2024                    For Spirit Airlines, Inc.

_____

Edward M. Christie III
President and Chief Executive Officer
Spirit Airlines, Inc.

Dania Beach, Florida

# In the
# United States Court of Appeals
## For the Fifth Circuit

No. 24-60373

SPIRIT AIRLINES, INC.,

*Petitioner,*

*v.*

UNITED STATES DEPARTMENT OF TRANSPORTATION,

*Respondent.*

Petition for Review of a Final Rule of the
U.S. Department of Transportation
Agency No. 89 Fed. Reg. 34620

**Declaration of Barry L. Biffle,
Chief Executive Officer of Frontier Group
Holdings, Inc. d/b/a Frontier Airlines**

Pursuant to 28 U.S.C. § 1746, I, Barry L. Biffle, hereby declare as follows:

**1.** I am the Chief Executive Officer of Frontier Group Holdings, Inc. d/b/a Frontier Airlines ("Frontier"). Frontier's principal place of business is 4545 Airport Way, Denver, Colorado 80239. I am authorized to make this declaration on Frontier's behalf, and I am personally familiar with the facts stated herein.

**2.** . Frontier, as it exists today, dates to 1994 in various iterations and began its transition to low fares in the early 2000's. In 2014, Frontier transitioned to an ultra-low-cost carrier (ULCC) business model. Frontier's business model focuses on providing travelers with low fares, flexible optional services, and a family-friendly customer experience with a more upscale look and feel than traditionally experienced on ULCCs globally. Frontier's recent innovations in the ULCC sector have included its "GoWild! All-You-Can-Fly" pass, offering unlimited flights across its network, and "UpFront Plus", a new upgraded seating option with extra space and comfort in the first two rows of its aircraft.

**3.** In 2024, Frontier accounted for approximately 3.6% of U.S. airline domestic market share.[1]

---

[1] Based on domestic revenue passenger miles between May 2023 and April 2024.

**4.** I understand the U.S. Department of Transportation (the Department) issued a final rule titled "Enhancing Transparency of Airline Ancillary Service Fees," 89 Fed. Reg. 34,620 (Apr. 30, 2024) (the Rule), which is the subject of the above-referenced case, and that the rule became effective on July 1, 2024.

**5.** In addition to other compliance costs, the Rule threatens Frontier with immediate losses to its sales channels accounting for 28% of Frontier's 2023 bookings, totaling approximately $1 billion in revenue.  Each day that Frontier cannot book through these agents, it will lose an estimated 28% of historically-expected bookings for that day. Frontier must immediately take action to protect the company's survival, as it now has three months to figure out how it can continue doing business with nearly a third of its revenue being shut off entirely.

**6.** Frontier's pricing for the optional ancillary services (Optional Services) regulated by the rule is dynamic and determined on a market basis relying on factors such as demand, seasonality, and the date and time of departure.

**7.** I understand the Rule imposes new, onerous requirements for Frontier regarding Optional Services, as well as broader areas of airline sales operations including:

a.  Preventing Frontier from offering percentage-off discounts on the price of a ticket unless Frontier also covers the discount for government taxes and other fees.

b.  Requiring Frontier to transmit voluminous passenger-specific and anonymous pricing data for Optional Services – including the cost of a carry-on bag, the first checked bag, the second checked bag, and any other Optional Services the Department decides it wants to require in the future – to all third-parties to which Frontier provides itinerary data, in a technical form that is "useable, current, and accessible in realtime."

c.  Requiring Frontier to effectuate, and develop the technology system that allows for, displaying anonymous and passenger-specific pricing data for Optional Services on the same webpage "during the itinerary search process at the first point where a fare and schedule is provided in connection with a specific itinerary." 89 Fed. Reg. at 34,621. This information must be provided for every flight option and fare bundle that a customer is presented with on the search results page.

8. I understand the Rule sets a deadline of October 30, 2024 by which Frontier must begin sharing the Optional Service data with ticket agents on an ongoing

basis. I further understand that whether the Department would deem Frontier to be in compliance with this requirement depends on a ticket agent's "reasonable efforts" to access the information as opposed to Frontier's efforts to make the data accessible.

**9.** I understand the Rule sets a deadline of April 30, 2025 by which Frontier must begin displaying across various locations on Frontier's website, mobile app, and any location on which it sells airfare both passenger-specific and anonymous Optional Service data associated with each itinerary, flight, and bundle combination on an ongoing basis.  I understand the Department considers it to be a separate violation each time the Optional Service information is not provided to a customer as required by the rule.

**10.** Compliance with the Rule will require Frontier to reengineer its entire booking/reservation platforms including systems supplied by third parties.  As stated below, this will involve direct costs to Frontier of millions of dollars. Aside from costs, Frontier does not expect it can meet the October 30, 2024 deadline, nor does it believe it will be able to meet the April 30, 2025 deadline.

**11.** For Frontier to place detailed information for Optional Services in the form the Rule requires and "at the first point where a fare and schedule is provided in connection with a specific itinerary" will require the airline to reengineer its

website, mobile platforms, and effectively re-develop its entire model for present-ing fare bundles.

12. As discussed further below, Frontier currently presents most customers with pricing for four (4) different bundle options in response to a flight search, each of which identifies the Optional Services included or not included with the price. To comply with the Rule, Frontier will now need to display up to five (5) separate prices for each of the four (4) bundle options, for every single flight shown on a search results page. Frontier believes the requirements of the Rule will create substantial confusion for its customers and overwhelm them with infor-mation, making their process for selecting a flight overly cumbersome.

13. In order to provide the information required by the Rule on an ongoing basis to ticket agents, Frontier will need to undertake arduous measures at a largely immeasurable cost under an impossible timeframe.  These measures in-clude, among others, the following:

    **a.** Software coding for Application Program Interfaces (APIs) which are the technology communications backbone of the systems through which Frontier and its third-party agents share pricing information.

    **b.** Negotiating agreements with Frontier's third-party ticket agents re-lated to all contractual and operational aspects involved with sharing

the data, including any fees Frontier would need to pay for third-party system updates so the information Frontier provides can be utilized.

    **c.**   Upgrading Frontier's information technology systems and processing power capacity as required for the sheer exponential volume of API requests that will be created by the Rule because the system will need to query for up to 12 prices, for every flight, to be able to display pricing for Optional Services not included with a fare. This is a 300% increase from the four (4) bundle prices currently shown on the search results page.

    **d.**   Creating and modifying customer user interface systems and making conforming changes on Frontier's websites, as well as its mobile applications, travel agent portal, and call center booking portal.

    **e.**   Validating and testing software changes.

**14.** Under current Department rules, Frontier already discloses pricing for Optional Services on its website. Customers can access pricing for baggage services in many places on Frontier's website before starting the booking process. On the main page of the Frontier website, Frontier provides hyperlinks labeled "New Bag Policy and Optional Services", "New Bag Prices" and "Optional Services" – each of

which lead the customer to webpages which have Frontier's "Bag Price Checker" tool. The Bag Price Checker allows customers to easily search for baggage prices in connection with a specific planned trip, as well as existing trips. Frontier also provides general disclosures concerning baggage pricing, as well as specific details regarding the maximum weight and dimensions allowed per bag.

**15.** On the initial flight search results page, Frontier displays different fare bundling options and indicates whether the fare price does or does not include baggage, as well as other optional products.

| | Basic Fare | Economy Bundle | Premium Bundle | Business Bundle |
|---|---|---|---|---|
| Personal Item | ✓ | ✓ | ✓ | ✓ |
| Carry-on Bag | | ✓ | ✓ | ✓ |
| Choose Your Seat | | Standard | Premium Extra Legroom | UpFront Plus Empty Middle Seat Extra Legroom |
| No Change or Cancel Fees | | ✓ | ✓ | ✓ |
| Board First℠ | | | ✓ | ✓ |
| Checked Bags | | | | 2 Bags (50lbs ea) |

**16.** This results in four (4) prices  - and four (4) queries for those prices on Frontier's systems – being shown.  To show pricing for all Optional Services required by the Rule multiplies this number to 12 prices and queries, **for every flight**, as follows:

   **a.**   The Basic Fare and bundle option prices (4 prices/queries)

**b.** The Basic Fare includes only a personal item, requiring additional prices for each of the four critical ancillary services to be shown (4 prices/queries)

**c.** The Economy Bundle does not include a first or second checked bag, so the cost of first and second checked bag must be shown (2 prices/queries)

**d.** Premium Bundle does not include a first or second checked bag, so the cost of first and second checked bags must be shown (2 prices/queries)

**e.** Business Bundle includes all critical ancillary services, so it does not require additional prices/ queries

**17.** For example, a traveler searching for flights from Orlando, Florida to Philadelphia, Pennsylvania departing on Monday August 26, 2024, could see 31 flight results. As shown in the screenshot below, for each flight the traveler is presented with pricing for the Basic Fare option and for each different bundle option (indicating which Optional Services each bundle includes).



**18.** The Rule will require Frontier to now fit into the same screen, for each of the four fare bundles above, on each of the 31 flight options, pricing for a first checked bag, second checked bag, carry-on bag, and change/cancellation fees for the Basic Fare. This example is just one route, on a single day, for one search. These onerous requirements demand Frontier implement vast technology improvements in a short timeframe to satisfy the enormous computational resources needed to ensure customers can see their itinerary results and the Optional Service

information in an acceptable amount of time without leaving Frontier's website frustrated.

**19.** Frontier's business model using dynamic pricing for Optional Services makes this problem substantially more difficult and costly to address. As a low-cost carrier, Frontier does not have a large in-house information technology (IT) infrastructure, and the changes will be extremely disruptive to Frontier operations. Frontier's reservation system is provided by a third-party vendor, and Frontier will have to fund the third-party costs associated with the required changes.

**20.** Importantly, it is essential for Frontier's business that consumers be able to conduct a search and make a purchase within a reasonable period of time. Increasing the processing time for searches increases the rate of customers who give up on a search because it was not fast enough. Even if Frontier could complete the system development and upgrades needed by some later date, the Rule's new requirements would still significantly slow down the processing time for a search and will forever require substantially more computational resources to meet the demand of multiple additional pricing queries for Optional Services needing to be displayed on the same page as the fare price for each day, each flight, and each fare and bundle for a particular market. Frontier will be required to commit currently immeasurable resources that it would not have otherwise needed to commit

to significantly increase the speed of its search function, all as an attempt to mitigate possible loss of bookings due to customers who have given up as a result of slowed search functionality caused by the Rule.

21. Frontier's experience with millions of travelers shows that the vast majority of its passengers have no issue with Frontier's current method of providing pricing information for Optional Services.

22. Frontier has been assessing the technical changes required to implement the Rule over the past several weeks and has concluded that it will not be possible to comply by the October 2024 or April 2025 deadlines. Without a stay, Frontier will likely face extreme losses to its revenue, or Frontier would only be able to achieve partial compliance with the Rule and be subject to billions of dollars in civil penalties.

23. In recent months, Frontier has undertaken substantial changes to its products and services. Diverting staff and capital expenditure away from priority revenue-enhancing projects and IT upgrades to instead work on Rule compliance will lead to significant lost revenues. These projects, now underway or planned for the near term, include, *e.g.*, revisions to the merchandising of Optional Services, enhanced bundling options, cybersecurity initiatives, and changes to loyalty and af-

finity card programs. Diversion of resources from those projects will result in sub-

stantial forgone revenues estimated to range between $30-50 million over the next

six months.

**24.** To make the changes required and complete the other systems projects

that are planned, Frontier will need to hire additional staff, including third-party

contractors. Obtaining new talent takes time, and Frontier will need to begin its

search and hiring process immediately. Frontier is also doing significant work to

comply with the Department's automatic refund rule. Many of the same individu-

als are involved in the planning and execution of Frontier's compliance with the

two outstanding rules.

**25.** It bears emphasis that Frontier will also need to renegotiate contracts

with ticket agents, Global Distribution Systems (GDS), Online Travel Agents

(OTA), and tour operators. Negotiations will concern the details of the information

sharing requirements, including which entity will take on the technical burden and

costs. Frontier will have to scope out technical requirements and build individual-

ized connections with each distribution partner.

**26.** Effectuating these technical updates on the systems by which Frontier

sends information to distribution partners will require several iterations of the fol-

lowing:

a. Writing revisions to Frontier's software code.

b. Testing whether the revised software program works with the several existing software programs.

c. Fixing the errors identified by testing.

d. Revising the plans for how the portions of the software code will interact and how the team will distribute workload.

e. Writing further revisions to the code, restarting the cycle.

This development takes too much time for Frontier to comply with the Rule by the October 2024 deadline.

27. Moreover, these software updates cannot be sped up simply by expending unlimited resources, which Frontier lacks. To the contrary, past a certain number of contractors, more software engineers working on these projects would slow down their implementation. Writing software code is like writing an essay in that a different person working on each section of an essay would create inconsistencies. With software code, inconsistent sections mean software that fails to function. Each new software engineer must also learn and familiarize themselves with the particularities of the airline industry, which takes significant time. The minimum amount of time needed to effectuate these updates cannot be overcome by hiring

more people. No amount of money or effort will make Frontier able to comply by the government mandated October 2024 or April 2025 dates.

28. Because Frontier will not be able to comply by October 30, it has two options for the period between October 30 and when they would be able to come into compliance. Frontier will have to either shut down selling through third-parties with which it cannot share Optional Services information, or Frontier will have to proceed with current sales in violation of the Rule subject to $75,000 per violation. Neither option allows Frontier to survive. Frontier is being squeezed to death between a rock and a hard place.

29. In addition to other compliance costs, the Rule threatens Frontier with immediate losses to its sales channels accounting for 28% of Frontier's 2023 bookings, totaling approximately $1 billion. Each day that Frontier cannot book through these agents, it will lose an estimated 28% of historically-expected bookings for that day. Frontier must immediately take action to protect the company's survival, as it now has three months to figure out how it can continue doing business with nearly a third of its revenue being shut off entirely.

30. The 28% of lost bookings does not account for customers lost due to the "billboard effect" of seeing Frontier travel options on third-party websites but thereafter going to Frontier's website to make the purchase. Consumers know they

can check prices on booking websites and then go to the carrier's website to input their rewards program information. Frontier cannot lose this revenue and continue to survive, because it is already operating at a loss.  In the first quarter of 2024, Fronter's net income was a loss of approximately $26 million.

**31.** The unrealistic alternative is for Frontier to continue operating in non-compliance and incur severe DOT violation penalties. Based on Frontier's 30,218,000 passengers flown in 2023, the penalty amount it faces starting in October 2024 for the 28% of bookings through its GDS partners would be **$1,738,569,863 per day**. In April 2025, the penalties could reach **$6,209,178,082 per day** to account for bookings through all channels, if Frontier is not fully compliant with the Rule.

**32.** These rules have a disparate impact on ULCCs versus low-cost and legacy airlines.  As a ULCC, Frontier operates with lower margins than other carrier models and are less able to cope with the Rule. Frontier is not in a position to bear the costs imposed by the Department when it is already struggling to regain profitability.

**33.** Unless the Rule is stayed, Frontier will not be able to recoup the millions of dollars in immediate compliance costs, nor the over $1 billion of possible lost revenues in the first year from dropping GDS sales channels. Customers will also

suffer from Frontier having to delay or abandon product enhancements necessary to satisfy existing and new customers. This is true even if the Court later finds the Rule to be invalid.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 26, 2024

Barry L. Biffle (Jul 26, 2024 12:13 CDT)

Barry L. Biffle
Chief Executive Officer
Frontier Group Holdings, Inc.

Denver, Colorado